UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLARENCE WILLIAMSON, JR.,

       Petitioner,                           Case No. 11-cr-20564
                                             Honorable Mark A. Goldsmith
                                             Magistrate Judge David R. Grand

v.

UNITED STATES OF AMERICA,

       Respondent.

_____/

## REPORT AND RECOMMENDATION TO DENY PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [630]

      Before the court is *pro se* Petitioner Clarence Williamson's ("Williamson") Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence and memorandum in support.  (ECF No. 630.)  The government filed a response (ECF No. 649), and Williamson filed a reply (ECF No. 655).  An Order of Reference (ECF No. 696) was entered on Nov. 7, 2019, referring Williamson's motion to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[1]

---

[1] Williamson requested that the Court hold an evidentiary hearing.  (ECF No. 630.)  The Court must hold an evidentiary hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . ."  28 U.S.C. § 2255(b).  Here, for the reasons explained below, the Court finds that the files and records of the case, as well as the Sixth Circuit's earlier decision rejecting Williamson's direct appeal, *United States v. Williamson*, 656 F. App'x. 175 (6th Cir. 2016), conclusively show that Williamson is not entitled to any relief.  Accordingly, the Court declines to hold an evidentiary hearing.

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Williamson's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence **(ECF No. 630)** be **DENIED**, and that a certificate of appealability also be **DENIED**.

## II.     REPORT

### A.      Background

Williamson began buying and selling cocaine in the Detroit area with Anthony Edwards ("Edwards") in 2000.  (ECF No. 609, PageID.3908.)  By 2003, the two decided to expand their operation beyond Detroit suppliers and found a new supplier in California.  (*Id.*)  Williamson arranged for the shipment of hundreds of kilograms of cocaine from California to Detroit with a simple plan: associates would drive a car full of cash to California, exchange the cash for cocaine, and drive the car back to Detroit.  (*Id.*)  Williamson would then deliver the drugs to his dealers who would sell them and turn the proceeds over to Williamson.  (*Id.*)  The process continued for several years.  (*Id.*)  Williamson would intervene if a problem occurred with the exchange.  (*Id.*)  For example, when police arrested one of his couriers, Kendrah Smartt ("Smartt"), in Nebraska, while she was driving cocaine back to Detroit, Williamson gave her money for bail.  (*Id.*)

Around 2008 or 2009, Williamson delved into the marijuana trade as well, organizing a similar transportation scheme.  (*Id.*)  He or his associates would drive a car full of cash to Arizona to meet the supplier and drive the drugs back to Detroit.  (*Id.*)

Police twice discovered Williamson's operation but he was not charged in either incident.  (*Id.*, PageID.3909.)  In a January 2005 incident, state troopers in Oklahoma stopped Williamson and some associates with $1.5 million in cash and two loaded handguns hidden in the car.  (*Id.*)  After disclaiming ownership of the money and guns, the troopers released Williamson and his

associates.  (*Id.*)  Then, in October 2008, police in California utilized a "reverse sting" operation to catch Williamson in a cash-for-cocaine swap.  (*Id.*)  Police arrested Williamson standing at the door of an apartment where the deal was to have taken place with a bag containing $150,000 in cash, but Williamson was once again released.  (*Id.*)

At some point, Williamson began operating his drug distribution business out of a Detroit warehouse nicknamed "The Factory."  (*Id.*)  Detroit police became aware of The Factory around 2010 and set up a "pole camera" to keep track of the operation.  (*Id.*)  With the aid of the camera, the police uncovered direct evidence of Williamson's drug trafficking.  (*Id.*)  Within a few months, police twice stopped vehicles leaving The Factory with bags of marijuana.  (*Id.*, PageID.3909–10.)

The police also used phone taps in their investigation.  (*Id.*, PageID.3910.)  By tapping the phones of Williamson's original partner, Edwards, police learned, in January 2011, that Williamson agreed to sell cocaine to a buyer named Carl Jones ("Jones").  (*Id.*)  Police followed the parties the day of a planned deal and ultimately arrested another man, Isaac Sheppard, for his role.  (*Id.*)

A federal grand jury indicated Williamson and seventeen other individuals in September 2011 on charges related to his drug trafficking operation.  (*Id.*)  Williamson retained an attorney, but over two years later, less than a week before his trial was set to begin, Williamson asked to replace his counsel, claiming a breakdown in communication.  (*Id.*)  The district judge who was then presiding over the case, the Honorable John Corbett O'Meara, granted the request but warned Williamson against further delays.  (*Id.*)

The day Williamson's rescheduled trial was to begin, nearly six months later, he once again asked for a new attorney, again claiming a breakdown in communication.  (*Id.*)  He told Judge O'Meara he had already retained different counsel who would be ready for trial in a few days.

(*Id.*) Judge O'Meara determined Williamson's assertion was false because, although he had contacted a different attorney, that attorney needed an additional six months for trial preparation. (*Id.*, PageID.3910–11.) Judge O'Meara denied Williamson's motion, and Williamson refused to move forward with his present attorney. (*Id.*, PageID.3911.) Judge O'Meara ordered Williamson to represent himself with the present attorney acting as standby counsel. (*Id.*)

The trial began as scheduled. (*Id.*) A jury was selected on the first day, but Williamson, who had been released on bond, did not appear for court on day two. (*Id.*) He had been admitted to a hospital, but Judge O'Meara noted that Williamson's hospitalization was consistent with past attempts to delay the case. (*Id.*) Judge O'Meara was also concerned about the delay in regard to Williamson's co-defendant, Terrell Clark, who was to be tried jointly. (*Id.*) Judge O'Meara indicated that he was considering revoking Williamson's bond, declaring a mistrial, and severing the co-defendants' trials from one another. (*Id.*) When there was no objection from Williamson's standby counsel or Clark's counsel, Judge O'Meara declared a mistrial and revoked Williamson's bond. (*Id.*)

Williamson spent a few days recovering from a diagnosed stroke in the hospital and several weeks in an inpatient psychiatric ward recovering from alleged lingering mental and physical problems. (*Id.*, PageID.3912.) He was then found competent to stand trial, and new counsel represented Williamson at that point. (*Id.*) Williamson moved to dismiss the indictment on the grounds that the mistrial was improper, and a retrial would constitute double jeopardy, but Judge O'Meara denied that motion. (*Id.*)

Following a three-week trial, a jury convicted Williamson on three counts: (1) conspiracy to possess with intent to distribute and to distribute cocaine and marijuana; (2) conspiracy to launder money connected to drug trafficking; and (3) conspiracy to possess a firearm in furtherance

of drug trafficking.  (*Id.*)  On June 9, 2015, Judge O'Meara sentenced Williamson to serve a term of imprisonment of 360 months on Counts 1 and 2 and a term of imprisonment of 240 months on Count 3, though Judge O'Meara indicated that all terms of imprisonment would run concurrently. (ECF No. 562, PageID.2438; ECF No. 570, PageID.2468.)  Essentially, then, Williamson was sentenced to 30 years in prison for his crimes.

Williamson appealed to the United States Court of Appeals for the Sixth Circuit, challenging his convictions on several grounds: (1) that he was subjected to double jeopardy in violation of the Fifth Amendment; (2) that there was insufficient evidence to convict him; (3) that a police officer impermissibly offered lay opinion testimony by interpreting recorded phone conversations for the jury; and (4) that the prosecutor impermissibly vouched for the credibility of a witness.  (*Id.*)  The Sixth Circuit found no reversible error in Williamson's convictions and affirmed his sentence.  (ECF No. 609, PageID.3907.)

### B.    Legal Standard

Under 28 U.S.C. § 2255, a prisoner sentenced by a federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" when "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. . . ."  *See* 28 U.S.C. § 2255(a).  The petitioner must demonstrate the existence of "a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure" in order for relief to be obtained.  *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)) (internal quotations omitted).

Further, good cause and actual prejudice must be shown if these issues were not brought up on direct appeal. *See Harris v. Reed*, 489 U.S. 255, 258 (1989).

Many of Williamson's arguments rest on assertions that his counsel was ineffective in representing him. A claim of ineffective assistance of counsel requires a petitioner to meet a two-part test – he must demonstrate that counsel's representation fell below an objective standard of reasonableness and that this deficient performance was prejudicial to the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). For counsel's performance to be deemed deficient, a defendant must overcome the strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance," with "judicial scrutiny of counsel's performance [being] highly deferential." *Id.* at 689. Moreover, "deficient" lawyering requires professional service that was worse than merely "inadequate; rather it . . . [means a performance that] was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (emphasis in original).

With respect to the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* at 694. Applying this reasonable probability standard to sentencing cases, a petitioner must show a reasonable probability "that, but for his counsel's alleged deficiency, he would have received a different sentence." *See United States v. Jones*, 308 F. App'x. 930, 932 (6th Cir. 2009); *see also United States v. DeGroat*, 102 F. App'x. 956, 959-60 (6th Cir. 2004) (finding defendant could not establish a reasonable probability that had her counsel objected to the drug quantity attributed to her at sentencing, her sentencing would have been different given that the drug quantity had been affirmed on direct appeal).

C.      Discussion

In his § 2255 motion, Williamson asks this Court to vacate, set aside, or correct his sentence based on ineffective assistance of both his trial and appellate counsel.  Williamson raises eighteen grounds which he claims entitle him to relief.  (ECF No. 630, PageID.3984–4031.)

1.      *Ground One: Trial counsel's failure to object to prior offense "hearsay" evidence and appellate counsel's failure to raise the issue on appeal*

Williamson first claims that the use at trial of what he calls "hearsay" related to similar prior acts was improper under Federal Rule of Evidence 404(b), and his attorneys at both the trial and appellate level were "ineffective in failing to object to and file against the use of the 404(b) evidence, which prejudice[d] [his] trial."  (ECF No. 630, PageID.3985.)  Specifically, Williamson points to the admission of evidence as to four prior acts that he claims was allegedly improper under Federal Rule of Evidence 404(b): (1) the Oklahoma vehicle stop, (2) the reverse-sting operation in California, (3) the testimony of cooperating witnesses Doris Houchins and Gregory Jackson, who each testified to their own interactions with Williamson, and (4) the testimony of Jackson regarding a gun incident in Pittsburgh, Pennsylvania.  (*Id.*, PageID.3984–85.)

Williamson argues that under Rule 404(b) a court may admit evidence of "other or similar bad acts or crimes only if the evidence is probative of a relevant fact, and not to show the [defendant's] character or propensity to commit bad acts."  (*Id.*, PageID.3985.)  Williamson argues that because he was never charged with or convicted of any crimes in any of the above-detailed situations, such extrinsic evidence should have been inadmissible.  (*Id.*, PageID. 3986.)  He also contends that, even if probative, evidence of his other acts should have been inadmissible because its value was outweighed by its prejudicial effect.  (*Id.*) (citing *United States v. Jenkins*, 345 F.3d 928 (6th Cir. 2003)).  Williams particularly objects to the evidentiary use of taped conversations

7

from 2011 with Edwards and Jones, claiming that because they were from a "separate drug conspiracy," they should have been inadmissible in his trial. (*Id.*)

The government counters that the "crimes Williamson committed were part of the charged conspiracies" and that he cannot provide any authority "that each [act] had to be charged separately." (ECF No. 649, PageID.4118.)

Federal Rule of Evidence 404(b) provides that evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, [or] plan," Fed. R. Evid. 404(b)(2), even if it cannot be used to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

Federal Rule of Criminal Procedure 52 delineates the difference between "harmless" and "plain" error. Harmless error is "any error, defect, irregularity, or variance that does not affect substantial rights" and "must be disregarded." Fed. R. Crim. P. 52(a). Plain error is "error that affects substantial rights" and "may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b).

Williamson misses the mark on Ground One. Whereas Federal Rule of Evidence 404(b) prohibits the use of evidence to demonstrate a person's character, here the alleged acts Williamson objects to were not "character" evidence, but rather, evidence regarding the overall conspiracy he was charged with. The government could also have reasonably offered the evidence to prove "motive, opportunity, intent, preparation, [or] plan." Fed. R. Evid. 404(b)(2). As discussed above, the evidence tying Williamson to the four previous acts he objects to, and the evidence tying those acts to the overall conspiracy Williamson was charged with, is strong. Given that strong evidence, this Court cannot say that either trial or appellate counsel acted in an objectively unreasonable

manner in not objecting to such evidence under Federal Rule of Evidence 404(b).  Accordingly,

Williamson cannot meet the *Strickland* standard's first prong, and this claim fails.  *Strickland*, 466

U.S. at 688.

> 2. *Ground Two: Trial counsel's failure to raise a statute of limitations defense and request a jury instruction concerning overt acts, and appellate counsel's failure to raise these issues on appeal*

Williamson next claims that his counsel was ineffective in failing to "challenge the [five

year] statute of limitations under 18 U.S.C. § 3282, fail[ing] to request [j]ury [i]nstructions

concerning overt acts, and fail[ing] to request dismissal of [i]ndictment."  (ECF No. 630,

PageID.3988.)  Williamson argues the district court "committed reversible error when it did not

instruct the jury concerning the effect" of the statute of limitations, which "prejudiced

[Williamson] from receiving a fair trial."  (*Id.*)

Williamson argues that he withdrew from the conspiracy in January 2005 after the

Oklahoma traffic stop and, that because he was indicted and charged in September 2011, the

government can only use evidence from 2006 to 2011 to prove the drug conspiracy.  (*Id.*,

PageID.3989.)  He contends that evidence of the Oklahoma and California incidents should "be

considered as unchargeable [o]vert [a]cts since [they] did not fall within the limitations period."

(*Id.*, PageID.3990.)  Williamson relies on his own claim of withdrawal from the conspiracy after

2005 and his recollection of the testimony of Jackson, who, according to Williamson, testified that

Williamson did not sell drugs after 2005.  (*Id.*, PageID.3991.)

Williamson also requests that this Court find that his trial counsel's failure to "object to the

absence of a jury instruction that the jurors must find overt acts in furtherance of the conspiracy

within the [five year] limitations period" and his appellate counsel's failure "to have the issue

reviewed for plain error" constitute ineffective assistance of counsel.  (*Id.*)

The government argues that "evidence (including testimony, video tape, [Williamson's] fingerprints on drug packaging material and other evidence) squarely contradicts Williamson." (ECF No. 649, PageID.4119.)  The government's argument is that "[t]he record clearly establishes that the conspiracies were on-going" beyond 2005 (*id.*), and that attorneys are not required to "present this type of specious argument at trial."  (*Id.*)

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues."  *See Jones v. Barnes,* 463 U.S. 745, 752 (1983).  The Supreme Court has long recognized that counsel provides the benefit of "examination into the record, research of the law, and marshalling of arguments" on a client's behalf.  *Douglas v. People of State of Cal.*, 372 U.S. 353, 358 (1963).  "Access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case . . .'"  *Strickland*, 466 U.S. at 685 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942)).  "Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Id.* at 688. Counsel's competence to make strategic decisions at trial is presumed by the courts.  *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (citing *Strickland*, 466 U.S. at 689)).  The Supreme Court has also acknowledged that "[t]here are countless ways to provide effective assistance in any given case."  *Strickland*, 466 U.S. at 689.

Williamson's trial and appellate counsel acted objectively reasonable in deciding that Williamson's Ground Two claim was not a compelling argument at either level of the proceedings. The government presented strong evidence that Williamson was engaged in the conspiracy well beyond 2005, refuted only by Williamson's personal claim that he withdrew from the conspiracy in 2005.  (ECF No. 630, PageID.3989.)  Williamson's recollection of Jackson's testimony is faulty,

as Jackson testified that he dealt – in cocaine – with Williamson until 2010 or 2011.  (ECF No. 576, PageID.2977:10, 3005: 7.)  Both attorneys, facing the decision to raise the issue based on Williamson's claim versus the evidence presented by the government, acted reasonably in turning their attention elsewhere to defend Williamson.  Thus, Williamson's Ground Two claim fails.

> 3.   *Ground Three: Counsel's failure to object to a two-point sentence enhancement for possession of weapons during a drug offense*

Williamson argues that Judge O'Meara erred in applying a two-point enhancement for possession of a firearm in relation to a drug trafficking crime under United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(1).  (ECF No. 630, PageID.3992.)  He claims that there was no evidence connecting "the firearms found under a chair in the lounge area of the Factory to any transaction for a sale of cocaine," (*id.*), and there was "insufficient evidence to show that he possessed the weapon found in [T]he [F]actory for any purpose other than to protect the . . . accessories in the store."  (*Id.*)  He also contends that the guns found in the car during the Oklahoma traffic stop were not attributable to him.  (*Id.*)  Therefore, Williamson argues there was no nexus connecting any firearm to a drug sale to warrant the two-point sentencing enhancement.  (*Id.*, PageID.3993.)  His counsel did not adhere to his request to raise the issue.  (*Id.*)

In response, the government begins by noting that "sentencing guidelines claims are disfavored in a Section 2255 motion."  (ECF No. 649, PageID.4120.)  It then claims that "the evidence [against Williamson] was substantial," (*id.*), and cites to trial testimony that co-conspirators and witnesses testified to Williamson's use of firearms during drug trafficking.  (*Id.*)  Williamson's "appellate counsel argued unsuccessfully that there was insufficient evidence to convict him of the three conspiracies – including the firearms conspiracy – and Williamson lost in the Sixth Circuit."  (*Id.*)

The Sixth Circuit determined that evidence of guns found in a secret compartment of the car during the 2005 Oklahoma stop, the loaded gun found underneath a chair during the 2011 search of The Factory, and the testimony regarding Williamson's firearm possession during the trafficking operation was sufficient to "have allowed the jury to reasonably infer that Williamson agreed with his co-conspirators to possess firearms, and that they did so **for the purpose of furthering their drug trafficking enterprise.**"  (ECF No. 609, PageID.3923) (emphasis added.) The court reasoned that "[i]t is not necessary that the gun be brandished or used during the commission of a drug offense, but it must 'advance, promote, or facilitate the crime,' *United States v. Street*, 614 F.3d 228, 236 (6th Cir. 2010) (quoting *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006)), and "a jury can reasonably infer that firearms which are strategically located so as 'to provide defense or deterrence in furtherance of the drug trafficking' are used in furtherance of a drug trafficking crime." *United States v. Couch*, 367 F.3d 557, 561 (6th Cir. 2004).  The Sixth Circuit having already decided the underlying issue against Williamson dooms his current claim.

The law is clear that a " § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) (citing *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996)).  Moreover, a defendant may not circumvent this rule of law by recasting previously rejected arguments as ineffective assistance of counsel claims.  *See Clemons v. United States*, No. 3:01-cv-496, 2005 WL 2416995, at *2 (E.D. Tenn. Sept. 30, 2005) (citing *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996)) ("[A movant] cannot use a § 2255 proceeding, in the guise of ineffective assistance of counsel, to relitigate issues decided adversely to him on direct appeal.").

12

Many of Williamson's present arguments violate these principles.  Williamson asks this Court to find ineffective assistance of counsel as it relates to his appellate attorney failing to raise the two-point enhancement on appeal, (ECF No. 630, PageID.3992), but the record shows the firearm conspiracy was raised on appeal, and the Sixth Circuit dealt directly with that claim, finding that the jury had sufficient reason to infer a link between Williamson and the guns.  (ECF No. 609, PageID.3923.)  Again, Williamson cannot recast that previously rejected argument as ineffective assistance of counsel.  *See Clemons*, 2005 WL 2416995, at *2; *Jones*, 178 F.3d at 796.[2]

For all of these reasons, this argument of Williamson's fails.

4.    *Grounds Four, Five, and Eight: Failure to object to and raise on appeal the four-point level enhancement for leadership role, two-point enhancement for friendly affection, two-point sentencing enhancement for "Maintaining a Premise," and two-point enhancement pursuant to U.S.S.G. § 2S1.1*

Williamson raises a number of issues regarding sentencing enhancements that were found to apply to him.  Specifically, in Ground Four, Williamson asserts that trial and appellate counsel were ineffective when they failed to object to at sentencing, and raise on appeal, the four-point level enhancement for his leadership role in the conspiracy (U.S.S.G. § 3B1.1(a)) and the two-point enhancement for his use of friendship/affection and family relationships in the conspiracy (U.S.S.G. § 2D1.1(b)(15)).  In Ground Five, he asserts that trial and appellate counsel were ineffective when they failed to object to at sentencing, and raise on appeal, the two-point sentencing enhancement for maintaining a drug premises (USSG 2D1.1(b)(12)).  In Ground Eight, he asserts that his appellate counsel failed to raise the two-point enhancement for laundering monetary instruments knowing they were proceeds of (or were intended to promote) narcotics

---

[2] Williamson's argument that his appellate counsel failed to specifically address the two-point sentence enhancement also fails because such an attack is subsumed within the one his attorney did raise on appeal about the charge itself.

distribution (U.S.S.G. § 2S1.1).  Similar to Ground Three, Williamson argues that there was an insufficient nexus between the overall conspiracy and his role in it for these enhancements to apply and that his counsel was ineffective in not raising these issues.  (ECF No. 630, PageID.3995.)

**Grounds Four and Five**

With respect to Ground Four, Williamson claims that "the district court made 'no factual findings' at sentencing" pursuant to Federal Rule of Criminal Procedure 32(c)(1) that warranted a six-point sentencing enhancement – four points for Williamson's leadership role and two points for his use of friendship/affection to further the conspiracy.  (*Id.*, PageID.3995.)  He contends that "the court committed Sixth Amendment error by relying on its own fact finding to impose the sentence enhancement."  (*Id.*)

Williamson cites to the factors in U.S.S.G. § 3B1.1 to argue that he "must have been an organizer or leader of a criminal activity that involved [five] or more participants, or was otherwise extensive," (*id.*, PageID.3996), and that the government did not provide sufficient evidence to warrant such a finding.  Particularly, Williamson suggests that the district court's reliance "on the findings in the pre-sentence report and the evidence at trial was not enough."  (*Id.*)  Williamson asks this Court to remove the six-point enhancement for his leadership role and friendly affection and resentence him without those enhancements.  (*Id.*)

The government cites extensively to the record in demonstrating that Williamson was, in fact, the leader and organizer of a conspiracy that included five or more participants.  (ECF No. 649, PageID.4121–22.)  The government offers evidence of Williamson's wealth compared to his co-conspirators' modest means to demonstrate the viability of the evidence that Williamson was the leader.  (*Id.*, PageID.4122.)

In Ground Five, Williamson argues that the two-point enhancement for maintaining a premise was wrongfully applied because he did not meet the elements for such an enhancement. He cites *United States v. Climer*, 591 F. App'x. 403, 414 (6th Cir. 2014), to argue that the enhancement applies to a "defendant who (1) knowingly; (2) opens or maintains any place; (3) for the purpose of manufacturing or distributing a controlled substance."   (ECF No. 630, PageID.3998).   Williamson argues that the district court should have considered "whether [he] held a possessory interest in . . . the premises and . . . the extent to which [he] controlled access to, or activities at the premises.  (*Id.*, PageID.3999) (citing U.S. Sentencing Guidelines 2D1.1, cmt. n. 17).  Williamson again turns to Federal Rule of Criminal Procedure 32 to argue the district court did not make sufficient findings to add the two-point enhancement.  Williamson points to the lack of utilities under his name at The Factory and his lack of ownership of the property.  (*Id.*)

The government argues that "[t]rial evidence clearly demonstrated that Williamson ran The Factory, which was the hub of his drug distribution, . . . had the key to The Factory, and conducted his business there."  (ECF No. 649, PageID.4124.)  The government again notes that sentencing guidelines claims are disfavored in ineffective assistance motions.  (*Id.*, PageID.4123.)

Federal Rule of Criminal Procedure 32(c)(1) requires "[t]he probation officer [to] conduct a presentence investigation and submit a report to the court before it imposes sentence unless . . . the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record."  Fed. R. Crim. P. 32(c)(1)(A)(ii).  "A district court may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings."  *See United States v. House*, 872 F.3d 748, 752-53 (6th Cir. 2017) (*citing United States v. Mulstread*, 42 F.3d 1097, 1102 (7th Cir. 1994) ("A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. . . . [H]e must

produce more than a bare denial, or the judge may rely entirely on the PSR.") (internal citations omitted)).  Moreover, as the government points out, the district court may base its fact-finding on the prior statements of a defendant's coconspirator "so long as it is not obvious that the statements were untruthful."  *See United States v. Cohen*, 515 F. App'x. 405, 413 (6th Cir. 2013) (quoting *United States v. Milan*, 398 F.3d 445, 457 (6th Cir. 2005) (internal quotations omitted)).  This is a "relatively low hurdle."  *See United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995).

The government presented strong evidence tying Williamson to a leadership role in the conspiracy and for friendly affection for using familial relationships to further the conspiracy. (ECF No. 649, PageID.4122.)  The United States Attorney's Office, the FBI, the DEA, and the United States Probation Department compiled information for Williamson's presentencing report, highlighting that "[beginning] in 2000, a drug conspiracy began in the metropolitan Detroit, Michigan, area led by Clarence Williamson, Jr.  (Presentence Investigation Report ("PSR"), p. 7, ¶ 14.)  The PSR also noted that "[s]everal of the co-conspirators are friends or relatives with each other."  (*Id.*)  A two-level enhancement was applied because Williamson used "his . . . family relationships during the conspiracy" including his sister Denise Williamson, his nephew Terrell Clark, and his girlfriend Doris Hutchins.  (*Id.*, p. 11, ¶ 31.)  The PSR noted that Williamson's family members "participated in a minimal way and received little compensation" and "had limited knowledge of [Williamson's] drug activities."  (*Id.*)  Because Williamson was "identified as the leader of the conspiracy, which involved more than five participants" a four-level enhancement was applied to his sentence.  (*Id.*)  The government argued at sentencing that "there were so many people that [Williamson] supervised and gave direction to in this case" to provide "plenty of evidence that [Williamson] was a leader and organizer" in the conspiracies.  (ECF No. 570, PageID.2464: 9–24.)

As to Williamson's objection to the enhancement for maintaining a premise, the court accepted the PSR's conclusion that "[d]uring the course of the conspiracy, [Williamson] maintained 'The Factory' for the purposes of loading and off-loading cocaine, marijuana, and currency." (PSR, p. 11, ¶ 31.)  At the sentencing hearing, the government referenced camera footage of Williamson at The Factory, testimony from coconspirators about The Factory, and the discovery of Williamson's fingerprints at that location, including on drug wrappings. (ECF No. 570, PageID.2465: 1–5.)

Williamson claims there were no factual findings made at trial or at sentencing to warrant a six-point sentence enhancement on those grounds, (ECF No. 630, PageID.3995), but the PSR and trial testimony paint a vastly different picture than Williamson's denial of involvement.  Judge O'Meara twice indicated at sentencing that he was accepting the PSR's proposed factual findings based on his review of the record – once toward the beginning of the sentencing hearing and again immediately after the government's attorney explained the facts which supported the sentencing enhancements. (ECF No. 570, PageId.2458, 2466.)  In short, Williamson's simple denial is not "evidence that contradicts the PSR's findings," *House*, 872 F.3d at 753, and his counsel can hardly be faulted for not objecting to the sentence enhancements given the strong evidence presented in the PSR and the testimony of Williamson's coconspirators.  Williamson's appellate counsel then had to make a strategic decision on which points to argue.  Based on the evidentiary picture presented at trial, this Court cannot say that counsel was deficient in failing to pursue the issues raised by Williamson.  Nor has he shown any reasonable likelihood that a different result would have occurred in the proceedings had Williamson's counsel specifically objected to the sentence enhancements.  Thus, this aspect of Williamson's claim fails.

**<u>Ground Eight</u>**

In Ground Eight, Williamson claims his appellate counsel was ineffective for not raising the issue of the two-point enhancement for money laundering on appeal after his trial counsel objected to the enhancement at trial.  (ECF No. 630, PageID.4009.)  Williamson argues that his trial counsel preserved the issue for appeal, but his appellate counsel failed to file a meritorious argument concerning the issue.  (*Id.*)  In support of this ground, Williamson contends the district court "failed to make an independent or particularized finding regarding" his objections to the enhancement.  (*Id.*)  He believes he was entitled to specific findings as to each sentencing enhancement objection pursuant to Federal Rule of Criminal Procedure 32(c)(1).  (*Id.*)  Williamson argues that "there is a probability that the [Sixth Circuit] would have vacated [his] sentence and remanded his case back to the district court for resentencing" if his appellate counsel had raised the issue on appeal.  (*Id.*, PageID.4010.)  He asks now for a "more thorough [explanation] of [the district court's] calculation."  (*Id.*)  The government counters that Williamson was specifically convicted of a money laundering crime by the jury, thus contradicting and negating his claim that it was an arbitrary court-enforced sentencing enhancement.  (ECF No. 649, PageID.4128.)

Williamson's arguments lack merit.  He was charged and convicted under a money laundering statute, 18 U.S.C. § 1956, and U.S.S.G. § 2S1.1(b)(2)(B) expressly provides for a two-point sentence increase when a defendant is convicted under that statute.  Judges must impose sentences based solely on facts reflected in the jury verdict and facts admitted by the defendant. *U.S. v. Booker*, 543 U.S. 220, 232 (2005).  Sentence enhancements must be based on facts that have been "proved to a jury beyond a reasonable doubt."  *Id.* at 244 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 492 (2000)).  The jury found Williamson guilty on the money laundering charge, and Judge O'Meara therefore appropriately applied a two-point enhancement to his sentence based

upon that conviction.  For the same reasons, an ineffective assistance of appellate counsel claim is groundless here, where counsel made a reasonable strategic decision to raise stronger claims.

> 5.   *Ground Six: Trial counsel's failure to request a* Franks v. Delaware *hearing where both the search warrant and affidavit were based on false, perjured, and misleading testimony before the magistrate judge*

Williamson claims that the testimony contained in page four, line eight of the search warrant affidavit presented to the magistrate judge was "perjured, false, and misleading."  (ECF No. 630, PageID. 4000.)  Williamson argues that Agent Koss's testimony "misled the Magistrate to believe that there [were] drugs located at" the particular address.  (ECF No. 630, PageID.4000.) Because no drugs were confiscated from that address, Williamson appears to be claiming that Agent James Koss lied to the judge in order to obtain a search warrant.  Williamson argues he should have been granted a *Franks v. Delaware* hearing because he could "make a substantial preliminary showing that a false [or] misleading statement necessary to the finding of probable cause was made knowingly and intentionally or with [reckless] disregard for the truth and was included by an affiant in a search warrant affidavit."  (*Id.*, PageID.4001.)  *See United States v. Hammond*, 351 F.3d 765 (6th Cir. 2002).  Williamson contends that his trial counsel should have requested a *Franks* hearing to suppress the evidence gathered from that search.  (*Id.*)  Williamson argues his entire trial was prejudiced by the lack of a *Franks* hearing to suppress the evidence. (*Id.*, PageID.4002.)

The government contends that the affidavit in question "was for non-drug evidence" and "does not contain a false statement."  (ECF No. 649, PageID.4125.)  The government argues a *Franks* motion would have been "wholly unsupportable," (*id.*) and Williamson's counsel cannot be considered ineffective for not raising the issue.

Under *Franks v. Delaware*, a criminal defendant is entitled to an evidentiary hearing when he makes a substantial showing that a false statement was included by the affiant in the warrant affidavit if the alleged false statement is necessary to the finding of probable cause. 483 U.S. 154, 155–56 (1978). There must be "an offer of proof" accompanying the allegation of falsehood. *Id.* at 171. There should be accompanying "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Id.* If those requirements are met, "and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required," *id.* at 171–72, but the defendant is entitled to a hearing if the remaining content is insufficient to support probable cause. *Id.* at 172.

Williamson labels Agent Koss's testimony "perjured" and "false." (ECF No. 630, PageID.4000.) However, Williamson offers no proof to substantiate this claim. A search warrant obtained under knowingly false pretenses would be problematic, but this Court cannot entertain Williamson's Ground Six claim without something more, including "an offer of proof" and accompanying affidavits or "otherwise reliable statements" as required by the Supreme Court. *Franks*, 483 U.S. at 171. Williamson did not provide any such evidence. Moreover, the mere fact that no drugs were found when the search was conducted does not show that the facts attested to in the affidavit were false; drugs could be present at a location on one day, and then moved, sold, or otherwise disposed of the next.

In short, Williamson failed to demonstrate, through "an offer of proof" or any other actual evidence, that he made a substantial showing of a false statement within the search warrant affidavit in question. Accordingly, his ineffective assistance of counsel claim as to this issue fails.

     6.    *Ground Seven: Trial and appellate counsel's failure to challenge false declarations made before the grand jury*

Williamson alleges that "Agents Koss and Robinson made false declarations to the [g]rand [j]ury in violation [of] 18 U.S.C. § 1623." (ECF No. 630, PageID.4003.) Specifically, Williamson claims that Agent Koss made a false representation about Williamson's involvement in the California reverse-sting incident and that Agent Robinson misled the grand jury with testimony regarding millions of dollars seized from Williamson. (*Id.*) Further, Williamson asserts that the prosecutor colluded with Agent Robinson to corroborate the false testimony. (*Id.*, PageID.4004.) In particular, Williamson objects to testimony that there were two separate $1.5 million seizures, arguing that such a seizure only happened once, during the traffic stop in Oklahoma. (*Id.*) He argues he was held accountable for additional drug amounts because of the false testimony about an additional $1.5 million. (*Id.*) In addition, Williamson argues that the phone call data sheets do not demonstrate any phone calls between he and any conspirators. (*Id.*, PageID.4005.)

Williamson asks this Court to find that his due process rights under the Fifth Amendment were violated "because he had to stand trial on an indictment which the Government knew was based on perjured testimony." (*Id.*, PageID.4006.) He cites a number of cases recognizing "the existence of a duty of good faith on the part of the prosecutor" with respect to the court, the grand jury, and the defendant. (*Id.*) He asks the Court to view his situation like *Napue v. Illinois*, 360 U.S. 264 (1959), in which the Supreme Court reversed the conviction of a defendant due to false testimony at trial. (*Id.*) He argues that the consequences of perjured testimony before a grand jury are no less damaging than such testimony at trial. (*Id.*, PageID.4007.)

On this particular ground, Williamson asks the Court to grant an evidentiary hearing with oral argument, to allow Williamson to demonstrate prosecutorial misconduct and the perjured testimony of Agents Koss and Robinson. (*Id.*, PageID.4008.)

In response, the government notes that grand jury indictments need only show probable cause, and that Williamson's trial conviction was reached by the "beyond a reasonable doubt" standard.  (ECF No. 649, PageID.4125.)  The government calls Williamson's claim on Ground Seven "a sham argument" because the government had even more evidence against Williamson relating to the amount of cash found that it did not raise at trial.  (*Id.*, PageID.4127.)  The government argues that Williamson's lawyers cannot be considered ineffective because raising the cash issue at trial would have led to introducing more evidence more damaging to Williamson. (*Id.*)  Further, the government suggests that Williamson's trial counsel did try to cast doubt on the phone calls referenced by Williamson, and there can be no finding of ineffective counsel where counsel argued the very point Williamson raises now.  (*Id.*, PageID.4128.)

18 U.S.C. § 1623 prohibits making materially false statements before a court or grand jury while under oath.  18 U.S.C. § 1623(a).  To set aside a conviction, a court must determine that the prosecution knowingly used such perjured testimony and that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). To "prevail on [a] claim that [the] conviction was obtained with the use of evidence that the prosecution knew or should have known was false," *id.*, the moving party must show three elements: "(1) the statements were actually false; (2) the statements were material, . . . ; and (3) [the] prosecution knew they were false."  *Id.*

The parties have differing views on the monetary seizures.  The record seems clear that $1.5 million was found only once in Williamson's direct possession.  (ECF No. 649, PageID.4108.)  The government argues that Agent Robinson testified that "over $1 million was twice seized from the Williamson *organization*."  (*Id.*, PageID.4126) (emphasis added).  That

contradicts Williamson's claim that the testimony was about two seizures of $1.5 million related to the Oklahoma stop.  (ECF No. 630, PageID.4003.)  Ultimately, though, the dispute is immaterial.  Robinson's testimony on this matter was made in front of the grand jury and not at trial.  (*Id.*, PageID.4003.)  Grand jury indictments may not be dismissed for errors "unless such errors prejudiced the defendant[]."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  Even if the grand jury heard only about a single $1.5 million seizure from Williamson, it defies all logic to suggest that that change would have led the grand jury to reach a different probable cause conclusion.  Moreover, because the testimony in question took place before the grand jury and not during trial, it had no impact on the jury's verdict against Williamson.  Indeed, he was tried and convicted partly on the basis of the $1.5 million that *was found*.

Williamson is adamant that the grand jury testimony regarding his phone call records is a lie.  (ECF No. 630, PageID.4005.)  Paralegal Otis Paris filed an affidavit on Nov. 14, 2018, in support of Williamson's § 2255 motion in part to further Williamson's claims that three individuals are on phone calls recorded by the government: Edwards, Geoffrey Hightower,[3] and Jones.  (ECF No. 658, PageID.4231.)  Williamson argues that "the [p]hone [c]all data sheet does not show any phone calls related to . . . Williamson."  (ECF No. 630, PageID.4005.)  However, the "calls were played both before the grand jury and the petite jury."  (ECF No. 649, PageID.4128.)  During trial, the government questioned Agent Dwayne Robinson about intercepted phone calls, and he explained, in detail, why he believed Williamson was one of the participants in at least certain of the calls.  (ECF No. 575, PageID.2877-83.)  Jackson also testified to Williamson being a

---

[3] One defense theory was that Hightower, not Williamson, was the supplier for Jones and Edwards. Isaac Sheppard, a cocaine buyer, testified that he believed Hightower's first name to be Geoffrey. (ECF No. 582, PageID.3625: 3–4.)  Other than that potential identification by Sheppard, Hightower was only referred to by last name during trial.

participant in certain of the relevant phone calls. (*Id.*, ECF No. 576, PageID.2990-91.) The government correctly argues that Williamson's trial counsel "vigorously argued" and "tried unsuccessfully to cast doubt on the accuracy and weight of those phone calls." (ECF No. 649, PageID.4128; ECF No. 582, PageID.3745-58.) Williamson cannot show ineffective assistance of counsel where his counsel *did* raise the issue.

In short, while any testimony presented to the grand jury that is inaccurate is most troubling to the Court, here, no reasonable person could say that any such inaccuracy impacted either the grand jury's probable cause determination or the trial jury's guilty verdict.

> 7.   *Grounds Nine, Fifteen, Seventeen, and Eighteen: Failure to seek suppression of text messages and other evidence*

Williamson makes a number of challenges based on his counsel's failure to zealously move to suppress certain evidence that he claims was obtained in violation of his rights under the United States Constitution. In Ground Nine, Williamson contends that his trial counsel should have challenged, via a suppression hearing, the use of a text message made by an alleged co-defendant in the grand jury proceedings. (ECF No. 630, PageID.4010.)[4] Williamson bases this assertion on the claim that Nebraska state trooper Robert Pelster gave Sergeant Downing the cell phone recovered from Kendrah Smartt after her arrest in order to dump all the data from the phone. (*Id.*, PageID.4011.) Williamson relies on 18 U.S.C. § 2518(10)(a), "which provides for suppression of

---

[4] Ground Seventeen relates to this same cell phone evidence. While Ground Nine refers to the use of that evidence in front of the grand jury, Ground Seventeen deals with Williamson's trial. Williamson contends that his trial counsel's failure to move the court "to suppress any and all evidence and testimony" related to the Nebraska traffic stop and arrest "fall below the norms of [professional] conduct that [is] expected [] from attorneys," because it "permitted the [g]overnment to introduce illegally obtained and highly incriminating evidence" against him. (*Id.*) Despite trial counsel's objection to the evidence, Williamson believes his counsel should have moved for a suppression hearing and, by failing to do so, was prejudicially ineffective. (*Id.*) Williamson uses the same argument for Ground Eighteen that he used in Ground Seventeen to claim ineffectiveness of appellate counsel in not raising the issue on appeal. (ECF No. 630, PageID.4031.)

evidence derived therefrom on the grounds that (i) the communication was unlawfully intercepted, (ii) the order of authorization or approval under which it was intercepted is insufficient on its face, or (iii) the interception was not made in conformity with the order of authorization or approval." (*Id.*) *See United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007).  Moreover, in 2014, the Supreme Court outlawed police searches of digital information on cell phones from arrested individuals without a warrant.  (*Id.*) *See Riley v. California*, 573 U.S. 373, 386 (2014).  Williamson argues that although his trial counsel objected to the admission of the cell phone evidence and was overruled, counsel was ineffective for failing to move to suppress this evidence, and that as a result he waived his right to appeal that issue.  (ECF No. 630, PageID.4025–26.)

Ground Fifteen is based on Agent Robinson's testimony that there was no judicial authorization for the GPS tracking device placed on a co-conspirator's car.  (ECF No. 630, PageID.4024.)  Williamson claims that "GPS information gained from his co-conspirator[']s vehicle was used in violation of his Fourth Amendment rights and needed to have been suppressed."  (*Id.*, PageID.4025.)  Williamson's trial counsel requested a sidebar to note his objection to the GPS evidence based on an illegal Fourth Amendment search.  (*Id.*)  Trial counsel "requested a 'curative jury instruction' . . . which was never given by the [c]ourt at trial."  (*Id.*)  Williamson asks this Court to vacate his conviction based on these alleged Fourth Amendment violations.  (*Id.*, PageID.4013.)

As to Ground Nine, the government argues that, even if Williamson is correct in his Fourth Amendment analysis, he has no standing because the cell phone in question was not his.  (ECF No. 649, PageID.4130.)  The government relies on *U.S. v. Payner*, 447 U.S. 727, 728 (1980) to argue that Williamson does not have standing to challenge the seizure of somebody else's cell phone.  (*Id.*)  In addition, the government notes that Smartt cooperated with the government to

build the case against Williamson, regardless of any claims she might have had regarding her cell phone.  (*Id.*)  Finally, the government argues that the phone "played no meaningful role at the trial" because the exhibit was withdrawn and not admitted into the record.  (*Id.*, PageID.4131.)

The government attacks Ground Fifteen from three angles.  First, the government notes that "[t]he placement of the GPS predated the *U.S. v. Jones*[,565 U.S. 400 (2012)] decision, [meaning] a warrant was not required at the time, and suppression would not have been appropriate."  (ECF No. 649, PageID.4135.)  Second, the government notes that Williamson's counsel *did* object to the GPS at trial, making Ground Fifteen moot.  (*Id.*, PageID.4136; ECF No. 574, PageID.2759: 18–24.)  Finally, similar to its argument about the cell phone evidence, the government argues that Williamson "lacks standing to challenge the . . . GPS . . . [because the] car was not his[,] and . . . he was not even an occupant."  (*Id.*)

The government again asserts its claim that Williamson lacks standing on the cell phone issue altogether.  (ECF No. 649, PageID.4137.)  The government further asserts Williamson lacks standing to challenge the admission of evidence related to the cocaine found in the car during the Nebraska stop because he was not the driver, was not a passenger, and was not the owner of the vehicle.  (*Id.*)  The government also argues that there was more than sufficient probable cause to search the vehicle, so even if Williamson had standing, he would still lose on the merits.  (*Id.*)

The government claims that Williamson's trial counsel was effective by bringing motions, objecting frequently, and presenting several theories of the case, and, therefore, appellate counsel "cannot be faulted for failing to challenge trial counsel's effectiveness."  (ECF No. 649, PageID.4139.) *See Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001).

The interception of electronic communications outlined in 18 U.S.C. § 2518 requires that "each application for an order authorizing [such interception] be made in writing upon oath or

affirmation to a judge," § 2518(1), and leaves to the discretion of the judge whether to approve the application. § 2518(3). At trial, "any aggrieved person . . . may move to suppress" intercepted communications on the grounds that: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval . . . is insufficient on its face; or (iii) the interception was not made in conformity with the order. . . ." § 2518(10)(a). A warrantless search altogether is a clear violation of the Fourth Amendment. *See Riley v. California*, 573 U.S. 373, 386 (2014). Only those whose Fourth Amendment rights were violated "by the search itself" can seek suppression, not "those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing." *Alderman v. United States*, 394 U.S.165, 172 (1969). An aggrieved person "must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Id.* at 173 (quoting *Jones v. United States*, 362 U.S. 257, 261 (1960), *rev'd on other grounds*, *United States v. Salvucci*, 448 U.S. 83 (1980)).

That principle was directly applied by this Court in *United States v. Powell*, No. 2:12-CR-20052-2, 2020 WL 3412285, at *4 (E.D. Mich. June 22, 2020), where the defendant filed a § 2255 motion after being sentenced to life in prison for his role in a drug distribution and money laundering scheme. Part of the defendant's argument centered on "the warrantless search and seizure of several vehicles during the investigation." *Id.* However, the warrantless searches were not conducted on any vehicles owned or operated by the defendant. The court ruled that Powell did not have a Fourth Amendment claim nor an ineffective assistance of counsel claim on that ground because "[t]he Fourth Amendment . . . 'does not justify the exclusion of tainted evidence at the insistence of a party who was not the victim of the challenged practices.'" *Id.* (quoting

*United States v. Payner*, 447 U.S. 727, 735 (1980)). The court ruled that without "a property interest . . . interfered with by the stop[s] of the automobile[s] . . . or a reasonable expectation of privacy that was invaded by the search[es] thereof," the defendant did not have a viable claim. *Id.* at *5 (quoting *United States v. Padilla*, 508 U.S. 77, 82 (1993)). "Mere 'joint control and supervision over . . . drugs and vehicle[s] and . . . active participation in a formalized business arrangement' of running a drug conspiracy is insufficient to establish a reasonable expectation of privacy." *Id.* (quoting *Padilla*, 508 U.S. at 80).

Thus, despite Williamson's misgivings and the alleged constitutional violation(s), the law is clear that he has no standing on either the cell phone or GPS claim. Williamson was not the direct victim of either search but, instead, was "aggrieved solely by the introduction of [the] damaging evidence" that resulted from them. *Alderman*, 394 U.S. at 172. Whether Smartt (the direct victim of the cell phone dump) or the victim of the GPS placement have their own constitutional claims against the respective authorities, those claims are theirs, not Williamson's, and thus he thus lacks standing to challenge either issue. *See id.* at 173. And, Williamson's trial counsel did object to the GPS. (ECF No. 649, PageID.4136; ECF No. 574, PageID.2759: 18–24.)

In short, Williamson's counsel cannot have been ineffective where Williamson had no valid legal argument to begin with. Moreover, Williamson's trial counsel raised the issue, and his appellate counsel cannot be faulted for not raising a losing claim on appeal. Accordingly, Williamson's arguments under Grounds Nine, Fifteen, Seventeen, and Eighteen lack merit.

8.    *Ground Ten: Appellate counsel failed to argue the drug amount on appeal under U.S.S.G. § 2D1.1 as preserved by trial counsel*

Williamson contends that the district court erred in attributing 450 kilograms of cocaine to him during sentencing. (ECF No. 630, PageID.4014.) He claims that the jury only convicted him of involvement with five kilograms of cocaine, but the district court adopted the PSR's finding

28

that included 450 kilograms. (*Id.*) Williamson's trial counsel objected to the quantity during sentencing but was overruled by the district court, which pointed "to estimates base[d] upon hearsay testimony of alleged co-defendants." (*Id.*, PageID.4013.) Williamson argues that "the district court should have held an evidentiary hearing when the facts were in dispute concerning drug amounts," pursuant to Federal Rule of Criminal Procedure 32. (*Id.*, PageID.4014.) Because the issue was preserved for appeal and Williamson's appellate counsel failed to raise the issue in front of the Sixth Circuit, Williamson argues his counsel's "performance fell below an objective standard of reasonableness and that, but for his deficient performance, there is a probability that the outcome would have been different." (*Id.*, PageID.4014–15.) Williamson requests resentencing on the issue. (*Id.*, PageID.4015.)

The government notes that the jury found Williamson "guilty of and responsible for five *or more* kilograms . . . of cocaine – not just five." (ECF No. 649, PageID.4131) (emphasis added). Thus, the government contends that "Williamson was responsible for more cocaine than that found by the district court," (*id.*) and that his appellate counsel's decision not to raise the issue on appeal was strategic in part to avoid a finding of a higher quantity. (*Id.*)

U.S.S.G. § 2D1.1, comment five provides that "[i]f the offense involved both a substantive drug offense and an attempt or conspiracy . . . the total quantity involved shall be aggregated to determine the scale of the offense." Federal Sentencing Guidelines Manual § 2D1.1, comment five (U.S. Sentencing Comm'n 2018).

Williamson seems to misunderstand and misconstrue his guilty verdict. The district court used the PSR in sentencing Williamson and heard an objection from Williamson's counsel. (ECF No. 630, PageID.4013.) The PSR indicated that Williamson "had loads of cocaine come to Detroit, Michigan, once or twice a month," for an average of eighteen trips annually. (PSR, p. 10, ¶ 29.)

"The quantities ranged from five to ten kilograms and over time became larger." (*Id.*) Williamson was deemed responsible for 1,350 kilograms of cocaine, which the report classified as "a conservative figure based on an average amount of cocaine per trip (7.5 kilograms) x [eighteen] (average number of trips annually) x [ten] years (length of conspiracy)." (*Id.*, p. 10–11, ¶ 29.) The Court started Williamson at a base offense level of 38 for "an offense involving 450 kilograms of cocaine *or more*," (*Id.*, p. 13, ¶ 37) (emphasis added). The PSR found him "nearly a thousand kilograms over that." (ECF No. 570, PageID.2463:17–18.) Williamson's offense level of 43, which included the point enhancements, was "as high as the chart goes." (*Id.*, PageID.2468:3–6.)

The district court has wide latitude in sentencing, and a reasonably strategic decision made by appellate counsel, knowing that the district court found Williamson was responsible for nearly 1,000 more kilograms of cocaine than necessary for the base offense level of 38, is not grounds for a finding of ineffective assistance.

> 9.    *Ground Eleven: Counsel failed to raise* Daubert *cocaine scientific testing issue on appeal, which was preserved by trial counsel*

Williamson contends that his appellate counsel was ineffective in failing to raise a *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) defense on appeal relating to the drugs. (ECF No. 630, PageID.4016.) The government's forensic science expert, Vicky Cowan, "stated at trial that she did not know the scientific formula for cocaine," and when pressed by Williamson's trial attorney on whether she could confirm the substance in question was cocaine, stated, "We confirm to a known standard and in that way we do not, I guess we do not confirm the scientific formula." (*Id.*) Williamson claims he requested appellate counsel raise this particular issue on appeal, but the appellate counsel's opening brief did not include the claim. Williamson asks this Court to find "a reasonable probability that inclusion of the issue would have changed the result of the appeal." (*Id.*, PageID.4015.) *See Greer v. Mitchell*, 264 F.3d 663, 674 (6th Cir. 2001).

The government responds that Cowan "has been a chemist/scientist in drug analysis for [eighteen] years and conducted drug testing thousands of times before" and was "qualified as an expert in . . . this case." (ECF No. 649, PageID.4132.)  Cowan performed three tests on the drugs, each of which were positive for cocaine.  (*Id.*)  The government contends that Williamson's argument on this matter is weak and his counsel's cross-examination of Cowan was more than sufficient to not be constitutionally deficient representation.  (*Id.*, PageID.4133.)  The government also points to the overwhelming evidence besides the cocaine test that the jury had to convict Williamson, arguing that the significance of the chemical formula for cocaine would not have changed the outcome of the appeal.  (*Id.*)

*Daubert* sets forth a five-factor test to determine the validity of expert witness testimony: (1) whether the methodology has been tested, (2) whether the methodology has been subject to peer review and publication, (3) the methodology's rate of error, (4) the existence and maintenance of standards controlling the methodology's operation, and (5) whether the methodology has attracted widespread acceptance within a scientific community.  509 U.S. at 593–94 (1993).  "Testimony must be supported by appropriate validation," meaning that there must be "a standard of evidentiary reliability."  *Id.* at 590.  The Sixth Circuit, in *United States v. Jackson*, determined that a "'normal procedure' and an accepted scientific practice in the forensic community that had proven to be a 'statistically accurate methodology'" was sufficient for expert witness testimony. 470 F.3d 299, 305 (6th Cir. 2006).  A jury is "entitled to believe the testimony of the government's expert witness [based on] measurement[s] . . . believed to be accurate to a reasonable scientific certainty."  *Id.* at 310.

*Daubert* requires an expert witness's testimony to be grounded in sound scientific methodology.  *See Daubert*, 509 U.S. at 593.  Cowan testified that she holds a Bachelor of Science

degree from the University of Nebraska-Lincoln and is a member of the Midwestern Forensic Scientists, the Southwestern Association of Forensic Scientists, and the Clandestine Laboratory Investigative Chemists. (ECF No. 580, PageID. 3467: 15–22.) Cowan testified that she has received on-the-job training in the relevant laboratory equipment. (*Id.*) She further testified that she has conducted thousands of narcotics tests during her eighteen years in the drug section at the lab. (*Id.*, PageID.3468:7–11.) She conducted three tests, each of which came back positive for cocaine. (*Id.*, PageID.3468:14.) Two of the tests were screening procedures: the first was a color test that identifies the presence of different substances and the second was a separation test to identify various "items." (*Id.*, PageID.3468:14–24.) The last test is a gas chromatograph mass spectrometer that confirms the substance. (*Id.*) Cowan identified and confirmed the substance in question as cocaine and prepared two reports explaining her findings. (*Id.*, PageID.3470:8.) Both the substance and Cowan's reports were entered into the trial record over the objection of Williamson's trial counsel. (*Id.*, PageID.3472:13–19.)

All that is required by the Sixth Circuit is a "normal procedure" that is proven to have a "statistically accurate methodology." *Jackson*, 470 F.3d at 305. Absent sufficient proof that Cowan's process failed to follow accepted scientific standards, Williamson does not have a viable *Daubert* claim. Williamson's trial counsel had ample opportunity to cross-examine Cowan at trial and did so. (ECF No. 649, PageID.4133.) The jury heard that cross-examination and chose to convict Williamson. (*Id.*) Williamson's appellate attorney was not required to raise every issue Williamson requested. Counsel's strategic decision not to raise a weak *Daubert* claim is objectively reasonable and did not prejudice Williamson. *See Strickland*, 466 U.S. at 687. Thus, this claim lacks merit.

       10.     *Ground Twelve: Trial counsel failure to confront witnesses and to provide Williamson a fair trial*

               *Ground Thirteen: Appellate counsel's failure to raise a hearsay objection*

Williamson objects to his trial counsel's failure to object to the "hearsay testimony of Agent Dwayne Robinson." (ECF No. 630, PageID.4017.) Williamson recounts that Agent Robinson testified "that on January 31, 2011, he, Agent Koss, and other members of the [FBI Violent Gang and Violent Crime Task Force] set up surveillance in the vicinity of a house . . . for the purpose of observing a multi-kilogram cocaine transaction." (*Id.*, PageID.4018.) Agent Robinson testified that he was a block away from that house when other agents alerted him via radio transmission that Williamson had pulled up to the house. (*Id.*) Agent Robinson then testified that the other agents told him via radio that they "observed Anthony Edwards come out of the house . . . and walk to [Williamson's] truck and retrieve a package believed to be two kilograms of cocaine." (*Id.*) Williamson believes that his counsel's failure to object to Robinson's testimony violated Williamson's "right to confront adverse witness[es] against him as provided by the Sixth Amendment" and by *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). (*Id.*, PageID.4018.) According to Williamson, Robinson testified on behalf of non-testifying agents, relaying their testimony to the jury. (*Id.*, PageID.4019.) Williamson claims his counsel improperly failed to object to such hearsay testimony and that this failure "allowed the hearsay testimony of the [g]overnment[']s lead case agents to place [Williamson] on the scene." (*Id.*, PageID.4019–20.)

Williamson asks this Court to find that his appellate counsel was ineffective in failing to raise this issue on appeal. (ECF No. 630, PageID.4021.) He believes there is "a probability that the Sixth Circuit would have found a *Crawford* violation . . . and reversed and vacated" his conviction and sentence based on the hearsay testimony. (*Id.*)

In response, the government argues that the statements made by Robinson at trial were "present sense impressions and . . . not excludable hearsay." (ECF No. 649, PageID.4134.) Alternatively, the government contends that even if the statements were hearsay, Williamson's counsel's failure to object in that particular instance was not ineffective assistance of counsel because he made numerous other objections throughout the trial. (*Id.*) In summation, the government believes that this particular issue "could not have changed the outcome of the trial" and thus does not demonstrate the necessary prejudice under *Strickland*. (*Id.*)

Federal Rule of Evidence 803(1) carves out an exception to the rule against hearsay for "present sense impressions." These impressions are statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "This exception permits the introduction into evidence of a statement that is describing or explaining an event made while the declarant was presently perceiving the event or immediately thereafter, thus, providing a necessary requirement of contemporaneousness." *Miller v. Stovall*, 742 F.3d 642, 650 (6th Cir. 2014). However, in *Crawford v. Washington*, the Supreme Court found "scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case." 541 U.S. 36, 56 (2004).

Indeed, "[t]he Confrontation Clause prohibits the admission of testimonial statements of a witness who did not testify at trial unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination. [] The Confrontation Clause does not apply, however, to nontestimonial statements." *United States v. Johnson*, 509 F. App'x 487, 494 (6th Cir. 2012) (quoting *Davis v. Washington*, 547 U.S. 813, 821 [] (2006) and *Whorton v. Bockting*, 549 U.S. 406, 420 [] (2007)). "'It is true that "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for

cross-examination.' []  'The admission of a testimonial statement, however, does not necessarily trigger a violation of the Confrontation Clause.'  Instead, to constitute a Confrontation Clause violation, 'the statement must be used as hearsay-in other words, it must be offered for the truth of the matter asserted.'"  *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (citations omitted). Thus, in a criminal case, if a witness is unavailable for the defense to cross-examine, the government must establish the unavailability of that witness.  *Crawford*, 541 U.S. at 57.  See also *Issa v. Bradshaw*, 904 F.3d 446, 454–55 (6th Cir. 2018) (holding that unless there is "an affirmative reason, arising from the circumstances in which the statement was made, [that] provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement.") (quoting *Idaho v. Wright*, 497 U.S. 805, 819 (1990)).

Here, the Court finds that Robinson's testimony in question was hearsay and should have been objected to.  Robinson essentially offered formal testimony on behalf of non-testifying agents relating to the charges against Williamson, and Williamson had no chance to directly cross-examine those agents about their alleged statements.  Such hearsay should be considered "testimonial" according to the standards set forth by the Supreme Court, and, absent the government establishing a good reason for the inclusion of such hearsay, which was not provided, Robinson's statements should have been objected to and inadmissible.

Williamson's counsel's failure to object, however, is not necessarily reversible error. Given the evidence presented against Williamson at trial, he failed to show a reasonable likelihood that striking Robinson's testimony from the record and instructing the jury not to consider it would have changed the outcome of Williamson's conviction.  The government presented evidence "of [s]everal large seizures of drugs and money," and "witnesses tied [Williamson] to those events."

(ECF No. 649, PageID.4104.)  Many of those witnesses were co-conspirators who cooperated with the government against Williamson "and testified at trial about [Williamson's] vast drug, money laundering, and firearms activity."  (*Id.*)  In addition, Williamson's "fingerprints were found on drug wrappings inside the Factory," and witnesses "testified about Williamson carrying firearms to confront his recalcitrant drug dealers."  (*Id.*) In light of those witnesses and their testimony, Williamson has not shown a reasonable likelihood that had the hearsay testimony of Agent Robinson describing the one specific event been omitted, the outcome of his trial would have been different.  Therefore, even if Williamson's trial counsel acted objectively unreasonable in not objecting to Robinson's testimony, Williamson is unable to establish that such a failure was "so serious as to deprive [him] of a fair trial," *Strickland*, 466 U.S. at 687, and that "the decision reached would reasonably likely have been different absent the error[]. *Id.* at 696.  For the same reason, Williamson's claim based on appellate counsel's failure to raise the issue in the Sixth Circuit lacks merit.

>    11.    *Ground Fourteen: Appellate counsel's failure to appeal the district court's order denying Williamson's motion to suppress U.S. currency*

The district court denied Williamson's motion to suppress evidence of the $1.5 million discovered during the 2005 Oklahoma traffic stop.  (*Id.*)  Williamson believes his appellate counsel was constitutionally ineffective by not appealing that suppression denial to the Sixth Circuit.  (*Id.*)  Williamson's trial counsel filed a brief in the district court that argued "even if the stop was valid, [Williamson's] Fourth Amendment rights were violated when the stop was impermissibly prolonged, and evidence was seized during the prolonged period."  (*Id.*, PageID.4022; ECF No. 448, PageID.1783, ¶ 7.)  The original stop was for a routine traffic violation, but the trooper "prolonged the stop by insisting to further question [Williamson] and the other occupants [with] questions . . . unrelated to the purpose of the traffic stop."  (*Id.*)  Williamson believes the stop

violated the standards set forth by the Sixth Circuit in *United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009), indicating that "all of the officer's actions must be reasonably related in scope to circumstances justifying the original interference." (citing *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)). Williamson argues that had his appellate counsel raised the issue on appeal, the Sixth Circuit would likely have found that the district court erred, and would have granted him a new trial. (*Id.*, PageID.4023.)

The government again argues that "attorneys do not have to pursue every facially viable claim." (ECF No. 649, PageID.4134.) The government claims that the facts are on its side because "both the registered owner of the van and Williamson consented to the search of the van" after "[t]he occupants gave differing and inconsistent statements." (*Id.*, PageID.4135.)

To detain a motorist longer than "reasonably necessary to issue [a] traffic citation" following a valid stop for a traffic violation, an officer "must have reasonable suspicion that the individual has engaged in more extensive criminal conduct." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *Id.* at 540 (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). Without reasonable suspicion, "all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *Id.* at 541 (quoting *Townsend*, 305 F.3d at 541). Officers may not otherwise improperly extend the duration of a stop to enable a check for criminal activity. *Id.*

37

Oklahoma state trooper Tracey Brown testified that he pulled over Williamson at 3 a.m. due to "unsafe lane movements" because Brown wanted to make sure the driver was okay to be driving "[a]t that time in the morning." (ECF No. 573, PageID.2628:22–2629:1.) Williamson told Brown he and his passengers were headed to Las Vegas, but Brown thought it "kind of funny that [Williamson] didn't know any of the sights that he was going to go see while he was in [the] Vegas area," nor could he describe "very much about the area that he was going to take this long trip and visit." (*Id.*, PageID.2632:4–8.) Brown testified that his suspicions were further aroused by a passenger in the backseat pretending to be asleep and ducking his head down when Brown and the passenger made eye contact. (*Id.*, PageID.2634:1–5.) One of the passengers in the car, whom Williamson had identified as his mother, (*id.*, PageID.2632:13–14), told Brown that she had been to Vegas "several times," but Brown thought it suspicious that she did not know the phrase "one-armed bandits, which is kind of Las Vegas lingo for slot machines." (*Id.*, PageID.2635:2–4.) In Brown's opinion, anyone who has gambled in Vegas before knows that phrase, so he "suspicioned that she had never been to Vegas before." (*Id.*) Brown's suspicions increased when that same passenger told him they were not going to visit family after Williamson had told Brown that was the purpose of the trip. (*Id.*, PageID.2635:6-11.)

Brown's testimony then turned to his search of the vehicle. Brown testified that Williamson gave a hesitant "no" response to Brown's question about there being any amount of money in the car and "kind of glanced" toward the vehicle. (*Id.*, PageID.2638:24–25.) Brown said Williamson "[s]eemed like he was getting real nervous." (*Id.*, PageID.2639:3.) At that point, Brown testified that he asked Williamson for consent to search the vehicle, and Williamson said, "Yeah, go ahead." (*Id.*, PageID.2639:5–7.) Before the search, Brown testified that Williamson had told him his so-called mother's name was Brenda, but Brown purposefully called her by the

wrong name of Dorothy to see how Williamson and the owner of the vehicle, Christel Mervin ("Mervin"), would respond. (*Id.*, PageID.2640:16–21.) They both affirmed Dorothy was the woman's name. (*Id.*) Brown offered this as confirming his suspicion that "this may have been a set-up family." (*Id.*, PageID2640:22–23.) During his "real quick search," (*id.*, PageID.2641:25), of the vehicle, Brown discovered a cellophane package containing U.S. currency in a hidden compartment under a piece of fabric in one of the compartment areas of the conversion van. (*Id.*, PageID.2642:7–24.) He testified that he then radioed for assistance, and the troopers took the van and the passengers to a task force office for a more extensive search, where the troopers found $1.5 million. (*Id.*, PageID2643:10–17.)

Establishing the true mindset of the trooper at the time of the stop is a difficult, if not impossible, task. The trooper needed to demonstrate "reasonable suspicion" to continue to detain Williamson and the other occupants of the car beyond the initial scope of the original stop. *Bell*, 555 F.3d at 540. The government contends that such reasonable suspicion was created when "[t]he occupants gave differing and inconsistent statements." (ECF No. 649, PageID.4135.) Courts are suspicious of traffic stops that last longer than the average stop. *See Bell*, 555 F.3d at 541. Further, the Sixth Circuit, in the *Bell* case, determined that factors like sounding nervous or rehearsed or repeating a story provide a minimal basis for reasonable suspicion. *Id.* at 540. Here, however, the Court notes that Brown was able to articulate multiple differing and inconsistent statements by the car's occupants, which together constituted reasonable suspicion.

The government also points out that trial testimony shows that Williamson and the registered owner of the car gave their consent to a search. (ECF No. 649, PageID.4135; ECF No. 573, PageID.2639-40.) Brown testified that he asked Williamson, "Would you give me consent to search the van?" (ECF No. 573, PageID.2639:5–7.) Williamson said, "Yeah, go ahead." (*Id.*)

Brown confirmed with Williamson that he had "no objection to [the search]," and Williamson said, "No." (*Id.*)  In addition, Brown testified that Mervin also gave him consent to search the vehicle. (*Id.*, PageID.2640:8.)  Brown then "went up [to the vehicle] to ask the other passengers to step out" so he could conduct the search because he had consent from both the operator and the owner. (*Id.*PageID.2641:22–24.)  Brown affirmed his testimony on cross examination by Williamson's trial counsel.  (*Id.*, PageID.2660:23.)  While Williamson disputes Brown's testimony, the jury could reasonably have credited it, and Williamson has not established Brown's testimony was false.

Finally, Williamson's trial counsel vigorously cross-examined Trooper Brown about the stop and Brown's reasoning for feeling the need to search the car outside the scope of the original reason for the stop.  Williamson's trial counsel quizzed Brown on everything from Williamson acting nervous, to the way Williamson said "no," to Williamson's glancing eye movements to what the vehicle occupants actually said about their trip and visit to see family.  (ECF No. 573, PageID.2660:8–75:7.)  Brown indicated that he regularly asks people he stops to sit in his police car and regularly asks extensive questions "about where somebody's going, where they're coming from during a regular traffic stop." (*Id.*, PageID.2663:9–11.)  Brown testified that having people sit in his police car during traffic stops was standard Oklahoma policy at the time of Williamson's stop.  (*Id.*, PageID.2664:12–19.)  Williamson's trial counsel tried to get Brown to admit that multiple people in the car said they were going to meet relatives, but Brown said, "No, I don't think" anyone except Williamson said that.  (*Id.*, PageID.2668:4–8.)  Trial counsel also argued that the occupants did not "give the answers that the officer claims they made." (*Id.*, PageID.2668:20.)  But, as noted above, the testimony is consistent with the government's position, and the jury was free to credit it.

Based on all of the foregoing, the Court cannot say that even if Williamson's appellate acted objectively unreasonable in not raising the issue on appeal, or that if he had raised it, a different outcome was reasonably likely.   Trooper Brown's detailed testimony established reasonable suspicion for a longer stop, and Williamson did not disprove Brown's testimony that consent was given to search the vehicle.  In short, appellate counsel was well within the sphere of objective reasonability in not raising this issue on appeal, which was unlikely to be successful, in any event.

12.     *Ground Sixteen: Trial counsel's failure to request* Brady *material*

Williamson argues that the "Title III investigation reports on Hightower" should be considered *Brady* material, and the prosecutor's failure to "disclose exculpatory statements and evidence" constitutes a violation.  (ECF No. 630, PageID.4026–27.)  Williamson contends that his trial counsel's "failure to request the *Brady* material from Hightower's Title III investigation violates the prongs in *Strickland*."  (*Id.*, PageID.4027.)

The government responds simply that it is "unaware of any *Brady* material."  (ECF No. 649, PageID.4136.)

The Supreme Court, in its seminal decision in *Brady v. Maryland*, declared that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material. . . ."  373 U.S. 83, 87 (1963).  Twenty-two years later, the Court further clarified its *Brady* analysis in *United States v. Bagley*, noting that "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial[, and] the conviction must be reversed [] only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  473 U.S. 667, 678 (1985).  The *Bagley* Court made specific reference to *Strickland v. Washington*, highlighting that "a new trial must be granted

41

when evidence is not introduced because of the incompetence of counsel only if 'there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 682 (quoting *Strickland*, 473 U.S. at 694.) A *Brady* violation "turns on the *cumulative* effect of all [evidence favorable to the defendant] suppressed by the government." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995).

Williamson's trial attorney filed an affidavit on Dec. 18, 2018, stating that he "asked the government prior to and during trial for all telephone calls of Hightower." (ECF No. 671, PageID.4310.) Williamson's counsel claims that he received "a very limited amount of Hightower calls, mostly hang ups and voicemails, and certainly not any extensive panoply of wiretap calls." (*Id.*, PageID.4310–11.)

While phone calls made by Hightower relate directly to Williamson's contention that Hightower was the one supplying cocaine to Edwards, the existence of any such intercepted phone calls not previously produced would not undermine confidence in the outcome of Williamson's trial given the other overwhelming evidence presented against him. As discussed throughout this Report and Recommendation, the government presented numerous other cocaine-related evidence against Williamson. For example, for several years after 2003, Williamson arranged the shipment of hundreds of kilograms of cocaine from California to Detroit using associates who would drive cross-country, swapping cash for cocaine. (ECF No. 609, PageID.3908.) The government relied on the arrest of Kendrah Smartt, one of Williamson's couriers, in Nebraska as evidence of Williamson's scheme. (*Id.*) Police "stumbled upon" Williamson's operation twice previously: finding $1.5 million in cash during the 2005 Oklahoma stop and catching him in a reverse-sting in California in 2008. (*Id.*, PageID.3909.) Detroit police then obtained evidence of Williamson's activities through surveillance of The Factory. (*Id.*) Even if counsel erred in not requesting the

information in question, the law is clear that Williamson can be granted a new trial only if he shows a reasonable probability that the result would have been different.  *See Bagley*, 437 U.S. at 678; *Strickland*, 473 U.S. at 694.  The foregoing evidence shows he cannot meet that burden here. Moreover, Williamson's trial counsel cannot be held ineffective for not requesting *Brady* material when he did request that material from the prosecutor.

## IV. Certificate of Appealability

When considering a § 2255 motion, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts.  A petitioner must obtain a certificate of appealability ("COA") before he may appeal the denial of his § 2255 motion.  28 U.S.C. § 2253(c)(1)(B).  A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  In cases like Williamson's, where the petitioner's claims are rejected on their merits, a movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a COA.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, for all of the reasons stated above, the Court finds that Williamson did not make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and cannot satisfy the *Slack* criteria.  Accordingly, the Court should deny Williamson a certificate of appealability.

## V. Conclusion

For the reasons set forth above, **IT IS RECOMMENDED** that Williamson's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence **(ECF No. 630)** be **DENIED**, and that a certificate of appealability also be **DENIED**.

Dated: Aug. 17, 2020                    s/David R. Grand
Ann Arbor, Michigan                     DAVID R. GRAND
                                        United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and E.D. Mich. LR 72.1(d)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 18, 2020.

                                        s/Eddrey O. Butts
                                        EDDREY O. BUTTS
                                        Case Manager